is number 243173 Patrick Santoro Jessica Landis against Tower Health and Meta Platforms Inc. Good morning, Your Honors. My name is David Cohen, representing petitioners Santoro and Landis. With the court's permission, I'd like to reserve five minutes for rebuttal.  Your Honors, wonderful to see you today. We are here challenging the district court's dismissal of prejudice, dismissal with prejudice of plaintiffs' eCPA negligence and privacy claims in a case having to do with the transmission of personal health information using metapixels and related technology. We believe and urge Your Honors to accept that the district court committed clear error in granting dismissal with prejudice of all claims based on the conclusion at the time that there were simply no facts available to justify an amendment. That decision is unsupported by the record in multiple respects, including the district court's own acknowledgment in its memorandum denying reconsideration that the plaintiffs could have had access to and could have pled additional facts supporting their claims. That's found in Appendix 16, 22, 28, and 29, the district court's own acknowledgment that the plaintiffs had access to additional facts. That conclusion was supported by the plaintiffs' statements in oral argument that they had access to additional facts to plead with more specificity, the claims of transmission. I think the problem with that is, from what I see in the case law, is that it wasn't an actual, that a statement at oral argument isn't a motion for leave to amend, nor is it an amended complaint. And under our case law, especially when you're at the fourth bite of the apple stage, you need to actually move for leave to amend. And if you don't attach the proposed amended complaint, that's not an abuse of discretion. So what we're challenging, Your Honor, is the district court's decision to dismiss with prejudice based on the conclusion that there were no more available facts, so amendment would have been futile. There is no evidence in this case whatsoever at the motion to dismiss stage that plaintiffs were unable to plead additional facts. That's simply not the case. The reference I'm making... Don't contest that the case law does say you need to move and attach a proposed amended complaint. It's just, even though you didn't do that, that's not what the district court said. So in terms of timing, at the motion to dismiss argument, the district court did not issue any holding or findings or conclusions concerning the plaintiff's claims, only saying that it would, pardon me, that it would not... He said, I think I have what I need to work on this. So following the argument, there was no decision to appeal... But our case law doesn't say you're entitled to get a brief from the judge that says, okay, here's what you need to say in your motion for leave to amend and what you attach. I mean, I guess what I'm saying is you don't contest that you didn't move, you didn't attach an amendment. Our case law says that. You're really just saying, but we did have facts in the district court. We're challenged... That we didn't. Your Honor, I'm trying to understand. I think that you're asking why... Certainly we are not claiming to have amended the complaint until after the motion to dismiss ruling. We did not do that. The third amended complaint was filed with the reconsideration motion. There's no magic to when that happened in our view. In terms of the propriety of the district court's ruling on the motion to dismiss, refusing leave to amend on the basis that there were no more facts that could be pled. That is clear factual error, both because the court at the time knew the plaintiffs had access to more facts to plead. The defendants have since acknowledged repeatedly that there were more facts to plead. The plaintiffs at the time said, if Your Honor requires more information, more detail to move the case ahead, we have it and we'd like an opportunity to submit it. Nothing stopped you from submitting it before the court made its decision? Only, Your Honor, that we tend as lawyers not to make filings without a reason. One good reason would be if we wait for the district court to issue an adverse judgment, we are going to have a much higher burden of proof mountain to climb than if we don't go back to the office based on this conversation with the court and as quickly as possible file an amended complaint. That would be one reason, wouldn't it? Except, Judge, that didn't happen here. Oh, I know that was a counterfactual, but you said, why would a lawyer do that? I'm suggesting isn't that one reason a lawyer would do it? We didn't. It is, Your Honor. You asked me a question I thought I owed you a courtesy of a response, so now I'd like your response to my response. Is it satisfactory or not? So at the motion to dismiss argument, we didn't have any indication from the district court one way or the other as to how he would rule. Why do you need an indication? You know that your complaint has to be sufficient. I mean, I think Judge Hardiman's point is the reason you file it the way you could in the first instance is so it is sufficient. So you can survive a motion to dismiss. I'm sorry for interrupting you, Your Honor. So I was about to say in our view, I don't even think it's a question of in our view. At the time these events were occurring, the pleading standard concerning this new novel theory was unsettled and developing. There were a dozen cases or more decided between the time we submitted our motion to dismiss brief and the time we received the motion to dismiss ruling. Eight of those 12 cases adopted our view of the pleading standard, which is also consistent with the wording of the HIPAA statute. Going to your response to our standing inquiry, you only refer to the third amended complaint, which seems to be an implicit concession that you don't have standing under the second amended complaint. Well, Your Honor, unless we can convince you that this motion to dismiss ruling should be overturned, we're out of court either way. Well, the difference is if you don't have standing, we instruct the district court to enter dismissal without prejudice. Right. So, Your Honor, on that point concerning standing and the decision in Cook v. Gamestop, the supplemental letter we provided distinguished the factual bases of those claims and the legal decision. Based on your third amended complaint. So I guess what I'm saying is based on your second amended, it seems an implicit concession that your second amended complaint doesn't establish standing since you wholly rely upon your third amended complaint. In which case, if you have no standing, seems you get what you want, which is a fourth bite at the apple because we would enter an order for dismissal without prejudice. Your Honor, I honestly hadn't considered that, but I think so. So I don't know how hard I want to push back against that if the result is as you say. But I think that making citation references to the pleadings in the third amended complaint in our Cook letter doesn't mean that the allegations in our second amended complaint differentiate Cook any less. But why did you rely on your second amended, which is the operative complaint? Right, right. So I guess from our perspective, Your Honor, having filed the third amended complaint, using it as an example of the allegations that the district court required of us, that for us is now the proof on the appeal of what was available at the time. It's the thing that undermines the motion to dismiss decision. So the facts that the district court concluded should have been present were necessary to meet the pleading standard, were not in the second amended complaint, but at the time they were available. So now we've provided that information, we've pled all of the information to survive the motion to dismiss. And we believe that that's the correct measure of how the case should be judged going forward. If we, if as a matter of law, it's necessary to establish standing and differentiate Cook based on the allegations of the second amended complaint, there is still a significant difference between the session replay code at issue in Cook and the individually identifiable health information at issue in the second amended complaint. They're different in nature. The IIHI is protected by HIPAA and session replay code, of course, is not protected by any federal statute. The other, it makes sense to also mention, we are not just challenging the district court's motion to dismiss ruling as improper, but also the opinion denying reconsideration. Your honor, I think mentioned the idea of the wait and see pleading like that. We had this stuff and we should have said it before or something like that. I think as we've briefed that theory, I see that I'm out of time. Go ahead and finish your, that theory doesn't simply doesn't apply here because of the analysis and the reply brief we submitted, distinguishing Jang versus Boston Scientific and In re Adams. Cases where the pleading standard was established and well-known and all of the information and the litigants knew ahead of time what they needed to plead in order to state those claims. Whereas here, as demonstrated by the supplement. You want us to distinguish those cases by saying that the law regarding session replay code and the like was in flux. So, session replay code is the issue from Cook that's. No, I know. That's why I said session replay code and the like, meaning that the things that issue here is not totally dissimilar. So the idea is, did we improperly abuse the judicial process by requiring the district court to issue a ruling when we should have known better what information he wanted us to plead? My answer is simply no, because the state of the. I don't think anyone's accusing you, including your friend on the other side of abusing the judicial process, but there's a pretty big gap between abusing the judicial process and actions whether strategic or otherwise have consequences. And the idea is that here, where the pleading standard is unsettled and in flux, there wasn't any reason or way for us to know in advance of receiving the. And that's why you say Jang and Adams-Golf don't apply. Right. And why we say Arthur versus Marisk and Garlick. Got it. Thank you very much, Mr. Cone. Thank you, your honors. Mr. Rayfield. Thank you. May it please the court, Mike Rayfield on behalf of the appellees. So we think the simplest way to resolve this case is to hold that the district court did not abuse its discretion by denying the plaintiffs a fourth chance to amend their complaint. But I understand that the court needs to assess its jurisdiction. So I'll start there unless you prefer that I do otherwise. So as you know, we believe that the plaintiffs lack standing. To establish standing, they had to identify a privacy tort that has a close relationship to their alleged harms. They didn't cite one in their letter. And as you've been pointing out, they've been relying on the third amended complaint, which is not the operative one. But under GameStop, I think their only real option as a comparator is intrusion on seclusion. And that is incomparable for two main reasons. The first is exactly why their claims were dismissed in the district court. The operative complaint does not, second amendment, second amended complaint, does not identify any specific information, either sensitive or otherwise, that the plaintiffs allegedly disclosed to Tower. The claims about these plaintiffs are limited to one paragraph each. And these allegations are just conclusory. They're lifted from the language of HIPAA. They don't tell us anything about the pages the plaintiffs clicked on, any search terms they entered, or anything about their own medical conditions. Now to be sure- Hold on one second. They say that whatever they did on the website would reveal individually identifiable health information about their past, present, or future health conditions. Why does that not suffice? Because that language is lifted directly from HIPAA. It's essentially a legal conclusion. They have, they need to identify, if they're going to allege that we violated HIPAA by just- Go ahead, Your Honor. Regardless of whether it's lifted from HIPAA, I think the question is whether information, individually identifiable health information about past, present, or future health conditions that was revealed by use of Metapixel would be akin to the harm of intrusion upon seclusion. Right. So again, I don't think that those allegations are specific enough to be comparable to the harm of intrusion on seclusion. But I'll get right away to my second reason. But they did say they searched for their doctors and the doctor's location. I mean, do they have to say the doctor's name? Isn't it enough to say, I put in my doctor's name, I searched for my doctor, I searched for my condition. If we know that the character of the information is the condition and the character of the information is the name of the provider, why is something more specific than that required? Because their entire claim is based on the idea that Tower Health committed highly offensive conduct, violated the wiretapping statute by violating HIPAA. To get an understanding of whether that's true, we need to know what they actually alleged, what they entered onto the healthcare. If they alleged that they put information on there about sexually transmitted diseases, would that suffice for standing? That gets me to my second reason for why they haven't established standing. I think the answer is no, because regardless of the content entered on the website, the plaintiffs, when you voluntarily disclose information to someone, that isn't an intrusion on seclusion, even if the recipient then discloses it to a third party. The tort that turns on third party dissemination is public disclosure of private facts. But under GameStop, that tort is out because there's only one third party here, meta, just like there was only one third party in GameStop, the session replay provider. There was no disclosure to the, quote, broader public, to use the words of GameStop. And as to intrusion on seclusion, our brief cites cases from Pennsylvania and elsewhere, explaining that, quote, courts generally agree that when a plaintiff voluntarily browses a health care website, there is no intrusion when a pixel transmits the information to  That's OCOSH versus Essentia Health, and you'll find- That's a disclosure. It's a different possible tort, a disclosure of private sensitive information. Right. But for that tort, you would need to allege a disclosure to the broader public. So- No, I understand. I'm just drilling down on, you're saying there's no intrusion for the purposes of an intrusion upon seclusion tort. Well, the quote I just read is talking about intrusion. It's saying, for intrusion, it doesn't count if you voluntarily disclose the information to the defendant. Which is what you do when you type something into the, but if, so let me ask you, if the, all right, now I lost my thought, I'm sorry, I do have a question for you, and it was based on that. Maybe while you're thinking about it, I was trying to, so the allegations in the complaint are that MEDA analyzes the data that's put on, let's say the sexually transmitted disease information, and builds profiles of the users and sells advertising based on that. And so, is there a fair inference that MEDA is distributing that information beyond Tower Health? And, right, Barcliffe was like an internal service provider, right? There was like a contractor, essentially, that was, that information was disclosed to you. But here, the allegation is that MEDA uses all of this information to sell advertising. There's an, so yes, there's no allegation that MEDA actually shares anyone's health information beyond MEDA. So I don't think there's a distinction with GameStop in that sense. In GameStop 2, the session replay provider was using the information to build some profile about each user. But actually, in this case, in the second amended complaint, the problem goes even further, because the plaintiffs don't actually ever allege that MEDA used their communications on Tower Health and connected them to their identities, which actually only happens under certain circumstances. You have to, it depends on the user's settings. It depends on whether the user was logged into MEDA at the same time that they're browsing Tower Health. So they're just, they've just fallen short in all sorts of ways to get, to allege a tort comparable to intrusion on seclusion, which is a very specific kind of tort. And when we're in the world- So can you, in Barcliffe, we said it's not element by element. It's just whether or not the harm is the same type. And the harm was pronounced as to what disclosure of private facts, that private, what is your Barcliffe-esque statement of harm that intrusion upon seclusion protects against? It protects against a highly offensive intrusion into someone's private affairs or seclusion. Now I- Basically, taking affirmative actions takes you out of the scope of intrusion upon seclusion. I think that's exactly right, Your Honor. Someone has to do it to me. I can't do it to myself. Yes. That's right. But the other tort, the disclosure of private facts, that could be where I engage with a website and then the website discloses, right? Right. But it has- But it has to be private. To the broader public. To the broader public. I have a question about, I'm not making an element by element argument here. Oh, no. I know. I just was trying to get what you would state that the harm is.  So the, you know, what, to go back to TransUnion, for example, the Supreme Court there said that being labeled a potential terrorist is comparable to being labeled an actual terrorist for purposes of the tort of defamation. There has to be a very close relationship. But voluntary disclosure to a single, to, voluntary disclosure to a defendant is nothing like intrusion on seclusion under well-established case law. And disclosure to a single party is nothing like public disclosure. So I guess I can, I can talk about the, the abuse of discretion issue. I just want to get back to the advertising, though. But if the, the allegation, and I'm looking at page 53 of the complaint, it says Metapixel intercepts the content of all communications on the Tower Health website, transmits it to data, to Meta, and Meta analyzes and uses that information for its own commercial purposes, including building both profiles of the user's preferences and traits, and selling more targeted advertisements. So the advertisements, would you agree that the advertisements would be sold to someone other than Tower Health? No. It's being sold, it's being sold to Tower Health. It's being, the advertisements, so, okay, let me make sure I'm understanding. The, my understanding of the way the technology works is Facebook, Meta uses this information to build a profile that it then uses to target advertisements to people, not just on Tower, users of Tower Health, but, but people in general. But it's never actually disclosing the communications to anyone. It's just aggregating the information and then giving aggregated data to the, to the websites, so that they can then target advertisements to their users. Is there a fair reading of this, though, where, so, like, the specific conditions that are mentioned on page 53 of the complaint are cancer care, breast cancer, chemotherapy treatment, et cetera. And is there a fair reading that, that someone who is looking for information about cancer care might be an appropriate target for advertisements by various pharmaceutical companies offering cancer treatment products? Are you talking about the second amendment, amended complaint? Yeah. Isn't that page 53? Appendix 53. I believe that's the second amended complaint. Yes, that's the second amended complaint. Well, I, I, I want to, I want to just highlight, this is not alleged as to these specific plaintiffs. If you go into the allegations on these specific plaintiffs, there's nothing about cancer care or anything like that. But, in answer to your question, I don't think that that would be comparable to either intrusion on seclusion or public disclosure. I don't think there's a fair inference that any of these communications are being shared outside of MEDA. And as to the, the issue of... Well, the communication might not be shared outside of MEDA, but I assume what MEDA does is MEDA says to the pharmaceutical companies that would address a cancer diagnosis, user number .103999, whatever, who goes on Tower Health's website, they're the ones you want to send the cancer ads to, not the dialysis ads. That's the way that works, right? I think that's right. Okay. So, is there something that sort of takes it out of intrusion upon seclusion or disclosure of private information because of the anonymity of the user? You don't know the user's name, address, et cetera, you just have a website or, I mean, an IP address? Yeah. An IP address, an advertisement. It doesn't tell you, it doesn't say, tell you anything about Mr. Santoro's health information. All right, but if MEDA, if some malevolent actor at MEDA wanted to learn about Mr. Santoro, they could connect his IP address with him, right? Yes. And then there, I mean, but there's nothing, I don't know if that's, I wouldn't call that malevolent. I would call that, that's what they're, they are using. Well, it could be malevolent in the sense that if, you know, if the person is, if Santoro was someone that the bad actor at MEDA didn't like and Santoro was researching, you know, cancer treatments for someone with six months to live or whatever, you know, the person that didn't like Santoro could take that information and weaponize it against Santoro, right? And if that happens, if there is some kind of weaponization, then there might be a real world harm. We're in the world where we're just asking whether there is, whether the disclosure alone is comparable to a, to a historically recognized privacy tort. Is there a reason to, to handle these cases identically or slightly differently than the session replay code cases? We've had several session replay code cases, but this is the first case I've seen involving MEDAPixel. So is there a meaningful legal distinction for how we should look at these cases? And if so, how? I respectfully would say no. I mean, both are tools that are used to analyze web traffic and both transmit information to third parties, either the session replay vendor or the pixel manufacturer. So I don't think the difference is material. There are, I'm not saying the technologies are exactly the same. They're primarily based on, they do slightly different things. Like one session replay is more about figuring out how users are navigating over the website as a whole, whereas the pixel is more about which like specific pages the person is using. It's not about, it's maybe more about advertising than it is about pure website functionality. But I don't think the analysis changes for purposes of standing. Would the court like me to address the abuse of discretion issue in the time I have left? Okay, I'll go ahead and do it for a minute. So we would say that if you get to this- You can find yourself in the same position Mr. Cohen did in the district court. You've gotten some questions from the court and you can decide whether you want to take action or not. You can tell us about that issue or you can sit down and as you see fit, whatever you prefer. Okay, I'll take a minute or two. So we would say the district court was completely justified in deciding that the plans for taking what this court has called a wait and see approach to pleading. And I just want to address two of the points that my friend made in his affirmative argument. One is the idea that they had gotten no guidance from the district court at all about whether they had to meet this pleading standard. I respectfully disagree with that. At the oral argument alone, the oral argument on the motion to dismiss, I counted more than 10 different times when the district court made the same basic point. He said right off the bat, your biggest problem is the specificity of the pleadings. He said, it matters to me exactly what the information is. He said, I am not on board with the plaintiff's view of this case. And most notably, I think, the judge explained that he'd reviewed several opinions dismissing PIXL cases and that the plaintiffs in those cases had alleged more detail than the plaintiffs here. But after. Why shouldn't that these plaintiffs have been expected to wait for the court to reduce its, you know, oral observations to an order and then respond to that order? Like, they had never. So, I know we're talking about a fourth bite at the apple, but none of the prior amendments had been in response to a court order. Fair enough. And if they had moved, made a motion for leave to amend directly after the oral argument, my argument might be a little bit weaker. But again, I just go back to the fact that this court has repeatedly rejected a wait for very good reason, because if the rule were otherwise, a party could simply withhold necessary facts, hope that he or she wins at the pleading stage, and then if he loses, then go turn around and amend the complaint. That's completely inefficient, and it undermines. Is that especially perilous when you're dealing with class actions and the difficult choice a plaintiff's lawyer might take? Because the more specific you are, the less likely you are to get a class certified or having a class of great numerosity. I think that's exactly right. I think every single class action plaintiff has an incentive to keep their allegations fairly general, because specifics would reveal often that their case is going to turn on individualized issues that defeat class certification under Rule 23b-3. And I just want, finally, I know I'm out of time, but I just want to get to the point that the case law was somehow in flux at this time. There's no question that there was a mix of decisions on these cases, absolutely. But there was no dispute about the pleading standard. Courts were simply applying the pleading standard in different circumstances, which happens every day. If plaintiff's logic were correct, then every time you had sort of a mix of case law in an area of law, the earliest cases that are filed would be subject to a higher standard than the later ones, because with the later ones, the law is in flux. But the opposite should be true. In the later cases, the plaintiffs have, if anything, more guidance in the plaintiff's words about the risks of dismissal, even though some of the cases are coming out in their direction. So, question about futility. We said in Fallon versus Mercy Catholic Medical Center that futility is a legal question. And the only grounds for the denial of leave to amend here was futility, talking about the original order on granting the motion to dismiss. So, why was it not legal error to say that it was impossible to plead more facts? I'm unaware of the case you just mentioned, and I'm happy to submit a supplemental letter on it. But my understanding, the district court did not just rely on futility. He relied, when he dismissed the complaint, he only relied on futility, which I think was within his discretion, because at the time, he had every reason to believe that the plaintiffs were either unwilling or unable to provide the specifics. Is unwilling futility? Okay, I agree with that. Unwilling is not, well, yes, I guess you can view it as a form of futility if the plaintiffs are unwilling. But, I mean, that would be, and we would have to judge whether they were unwilling, given their representation at the oral argument, that they could and would, if they were required to, that they would plead. I mean, they said specific conditions. They said gout or bunions or something. You know, they said, we can plead those if you need us to. Right, and so, just to go back to your original question, and I want to address what you just said, at the motion to reconsider stage, when the district court was presented with more facts, which we say still are not sufficient, by the way, at that point, he relied on a different ground for denying leave, which was undue delay, which is a separate ground, and that is clearly reviewed for abuse of discretion. Now, as to the idea that they proposed, they said at the hearing that they were allowed, that they were willing to come forward with additional facts. I just want to point, I'll just point the court to its decision in Ramsgate, the West Charter Bureau, where the plaintiff, where the court said, Ramsgate concluded its brief in opposition to the motion to dismiss with this sentence. However, in the event that the court concludes that the plaintiff fails to state claims upon which relief may be granted, plaintiffs and waste removal class respectfully request that they be granted leave to amend the complaint. That is the only mention of amending Ramsgate ever made before the district court, and it doesn't count as a motion to amend. In other words, there's no such thing as this conditional motion to, conditional request for leave to amend. You have to actually make the motion for leave to amend, and that makes sense under the court's wait-and-see doctrine, right? Because that rule wouldn't work if you could somehow ask for permission to take a wait-and-see approach to the pleadings. Thank you. Thank you, Mr. Rayfield. Let's hear rebuttal from Mr. Cohen. I think the, just from listening to the questioning, it makes sense for me to point out in our Cook letter at the bottom of page two, going on to the top of page three, and in the following footnote, addressing a separate privacy-based injury supported by the Nickelodeon and the In re Google cases as providing standing in those cases based on the defendant's representations that data or information would remain private and confidential, which is... But in those cases, they said they were not collecting data. Here, Tower specifically says it is collecting. I mean, I think this is going to the point of whether there's an intrusion. Forget about disclosures, just someone is providing information, and if they believe they're providing it under certain conditions, which is Nickelodeon specifically saying, we do not collect children's information, and then they are, then one could see how one who voluntarily submitted information thought, yet thought there was a sphere of privacy that was invaded. But here, it seems like the information is voluntarily provided, and there was no sphere of privacy created by any representation by Tower. And that's the point I'm making. I believe that's incorrect. You can read in our complaint, Tower's privacy policies and terms and conditions that create that sphere of protection by promising that the data collected will not be shared, will not be used, absent express notice. Well, but that's disclosure. I'm just talking about a sphere of privacy that can be intruded into, which in those cases, Nickelodeon, Google, it was the collection and the tracking. So as far as an intrusion, I understand you're making a separate point about then the further disclosure. That goes beyond the sphere of privacy. But the sphere of privacy is we'll collect it and keep it. It's not that we won't collect it. So when it's broken, it sounds like it's by disclosure, which is a different tort. So without belaboring this point, Judge, I would simply say that when someone understands that they're providing information under the promise that nothing will be done with it, that is the promise of the protection. It is not a separate thing to provide. They're providing the information under that promise. So if that promise is illusory, then the information that's being provided wouldn't have been given from our perspective. And where was that promise here? In all of the defendant's privacy policies in terms and conditions, terms of use for the website. It's repeatedly and consistently stated that all of the information collected, medical information collected would not be shared, would not be used, absent express authorization, absent notice. All right. But the medical information collected is different than whether I look at a website involving bunions. That's not collection of medical information. I'm not talking about my bunion. I'm just looking at a website, right? So that's a complicated distinction, Judge. That's really a who's in the class question. Well, I'm not sure it's ... I might be oversimplifying it, but to me it's not complicated because they're two very different things, right? So when Tower Health says, we're not going to disclose your medical information, I mean, that's sort of a given because of HIPAA and they're getting in a lot of trouble if they're disclosing that, right? But if I have a bunion and I navigate the Tower website to their foot page or their podiatrist page, then I haven't provided any information. In fact, the only information I've provided is that I have an interest in looking at the foot page or I accidentally clicked on the foot page, right? So, Your Honor, I apologize, but I believe you're mistaken. Okay. The definition of individually identifiable health information under HIPAA is exactly what you're saying. The idea that it's you, the idea that you care about bunions, the idea that you're ... That's not my health information because it's just as possible that I'm looking at the bunion page because my elderly parent has a bunion. So that's why I said in the first instance, Judge, that for us that's a question of who's in the class. How do we ... Do we define the class to include Tower patients? I don't think it's who's in the class. I think it's what does a person going to a web page say about that person's health information? And what I'm suggesting to you is nothing because I might be looking at that page because an elderly parent asked me to look into it. I might be looking into that page because I'm writing a research paper. I could look at that page for a hundred different reasons and one of those reasons might be I have a bunion. But Tower, by doing what it's doing, is still violating HIPAA even if your intention is to ... You have a research paper on bunions because the way they've set up the code and the pixels on their website is they're collecting your information. They're collecting- All right. When I go on the foot page on Tower's website, what, quote, information are they collecting from me other than the fact that my IP address went to the foot page? So the laundry list of things is set out in the pleadings, but it includes individual information to identify who you are, where you are, what you're looking at, when you're looking at it, how long you look at it, and many other things. But I mean, to Judge Hardiman's point, the exact document you rely on, which is not statutory, it's guidance, it's not a regulation or a statute, but it says, for example, when a user merely visits a webpage, hospital's webpage, blah, blah, blah, blah, blah, and it doesn't show identifying information ... Okay, sorry, wrong one. For example, if a student were writing a term paper on the changes in the availability of oncology service, if that's tracked, it would not be a violation of HIPAA. So we would, and this is, again, why I'm suggesting this is a class issue. Well, but we're talking about harm and standing, so what harm or standing have you alleged? Well, so the plaintiffs are not in that scenario. I see. All right, your argument is, under my hypothetical, if 99 people look at the website for something unrelated to their own health, they're not in the class, but the one in 100 who does go for his or her own health issue, that person's in the class. Yes, and I doubt the ratio is what you've suggested. It's probably much closer the other way. Tower Health is not a Cleveland clinic. You know, the people visiting Tower Health, they're not in Nebraska wondering, oh, that's got to be the dispositive authority on bunions. So we don't have discovery on this, and I'm doing nothing but hypothesizing, but my guess would be that the percentage of Tower website users who are actually Tower patients is far higher than one in 100. Okay, and you seem to be saying that HIPAA is the same as harm under the common law tort of intrusion upon seclusion, and I'm not sure that that is a sound assumption to make because intrusion upon seclusion, kind of rhymes, requires that the intrusion be highly offensive, and if you look at the restatement, it can be highly offensive either by the means of intrusion or even when the means of intrusion is, for instance, a public photograph, if the subject matter of intrusion is highly offensive. So I'm not sure, HIPAA just seems to say any disclosure at all is a harm, and it doesn't seem to have the same, it doesn't seem to be protecting the same harm that intrusion upon seclusion is protecting because it doesn't have that character, that intrusion upon seclusion, the tort, protects against. I suppose it's possible to disagree with that. For, I think for most Americans to be apprised of the fact that their personal medical and health information has been disclosed without their knowledge or permission would be extremely. I guess the reason I'm, so let's say Judge Hardiman's a librarian and I'm not internet savvy, and I say to Judge Hardiman with Judge Freeman waiting to talk to Judge Hardiman, she also has a research question, I say, my doctor said I need vitamin C. Can you tell me where the vitamin C is? Where a book on vitamin C is? I mean, I guess I'm just having, looking at the restatement, at the types of harm that the common law tort protects against, it's hard to say that just a blanket, any type of medical information would count as the harm that's protected against. And so I'm just, is it your position that it just doesn't matter? As long as my doctor said I need vitamin C, then that would be highly offensive and is the kind of harm that intrusion upon seclusion protects against. It is, Your Honor. Okay, so it's just, if it's health information, it's covered. It is the type of harm protected by intrusion upon seclusion. In our view, yes, Your Honor. And I read through, as my friend was presenting, I was reading through, following his letter and reading, listening to your comments about where this information was shared to third parties or not. And I think the discussion took a turn I wasn't expecting. Judge Hardiman, I think, noted it's not MEDA sending the targeted ads to the recipients. The path of the information goes from Tower Health to MEDA to then a host of third-party medical providers who sell sleep apnea treatments and incontinence treatments and cancer treatments. It is inherently disclosed far more broadly than just one third-party. So whether that's tantamount to public disclosure or not is hard to say for purposes. But wouldn't that be MEDA disclosing? I guess I'm just not sure. Is that the right defendant? So it's Tower. I mean, is that standing as to Tower? It's Tower providing the mechanism for the disclosure and it's Tower providing the information knowing that it'll be used this way, intending it'll be used this way, and in fact benefiting from it. Because- Would that be like saying if Judge Freeman were the person in my vitamin C example that Judge Hardiman is responsible when she goes and tells one of the counsel over here that I need vitamin C? So I mean- I'm understanding you that- He might be the mechanism because he's receiving it and he's close enough to her. But if she's the one who's actually disseminating it further, why is he responsible for that? Because this is the result of what MEDA has done. MEDA has designed the code- I'm sorry, Tower has done. Tower has designed the code with MEDA to serve this purpose and pursue this- serve this function, pursue this purpose. The idea of installing the MEDAPixel is to enable targeted ads, which generates all sorts of metrics that the hospital can- And Tower's getting paid by MEDA for that privilege. I don't know if Tower is being paid or not. We haven't had discovery on that. I don't want- I mean, I can tell you what I think, but that's not worth anything.  There are the potential for both economic and non-economic benefits to flow to Tower as a result of this scheme. Just briefly, Judge Hardiman, you asked whether MEDA could connect an IP address to a person who was submitting information on the Tower website. Yeah, Mr. Rayfield admitted it's- That's the very purpose of the personal profile. Right. So the goal of the scheme is to identify the specific person, identify their medical needs, and then direct advertisements to those people in a more profitable way than would be done to the general public. So the very heart of this is that the person who's making the communication be identifiable. And then- There are some other thoughts I had, but I don't know that they're crucial. I think- It happened to me too. Thank you. Thank you, Judge. I think we understand your argument, Mr. Cohen and Mr. Rayfield. We appreciate it. We'll take the matter under advisement. Thank you so much for your time today. It's been a pleasure.